UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| MAINE WOODS PELLET CO., LLC, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | 1:17-cv-00446-JCN |
| ) | |
| WESTERN WORLD INSURANCE ) | |
| COMPANY, ) | |
| ) | |
| Defendant ) | |

**DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

In this action, Plaintiff alleges Defendant breached an insurance contract by applying three separate deductibles, rather than a single deductible, to an insurance claim submitted as the result of mechanical difficulties with Plaintiff's heat and power plant.

The matter is before the Court on the parties' motions for summary judgment. (ECF Nos. 23, 25.) Following a review of the summary judgment record, and after consideration of the parties' arguments, the Court denies Plaintiff's motion and grants in part Defendant's motion.

**PROCEDURAL BACKGROUND**

Plaintiff filed its complaint in state court (State Court Docket Record, ECF No. 3-1; Complaint, ECF No. 3-4), and Defendant subsequently removed the case to federal court based on diversity of citizenship jurisdiction. (Notice of Removal, ECF No. 1.)

In connection with the anticipated motions for summary judgment, the parties filed a stipulated statement of material facts. (Stipulations of Fact, ECF No. 21, hereinafter SSMF). Plaintiff subsequently filed a motion for summary judgment, (ECF No. 23), and

an accompanying statement of material facts.  (ECF No. 21, hereinafter PSMF.)  Defendant

filed a motion for summary judgment on the same day.[1]  (ECF No. 25.)

FACTUAL BACKGROUND

A.     The Pellet Facility, the Cogeneration Plant, and the Condenser

Plaintiff owns and operates a wood pellet production facility in Athens, Maine.

(SSMF ¶ 28.)  For raw materials, Plaintiff purchases wood products from local woodlands

and wood chips and sawdust from a network of sawmills.  (*Id.* ¶ 30.)  The facility processes

the raw materials into wood pellets for both bulk and bagged fuel markets.  *Id.*

The pellet production facility includes a heat and power plant.  (*Id.* ¶ 28.)  This

cogeneration plant began operating in October 2016.  (*Id.* ¶ 29.)  During the wood pellet

production process, certain raw materials, including tree bark and wood chips with

excessive moisture content, known as biomass, are gathered and staged in a warehouse for

subsequent use as indirect fuel for the cogeneration plant.  (*Id.* ¶ 31.)

The cogeneration plant includes traditional power plant components such as a

boiler, heat exchanger, turbine and condenser.  (*Id.* ¶ 32.)  The system uses cyclopentane

as the "working fluid" rather than water.  *Id.*  During operation, liquid cyclopentane is

heated and converted to a vapor.  *Id.*  The vapor flows to a turbine producing mechanical

energy in the form of turbine shaft rotation.  *Id.*  The turbine is connected to a generator

which produces electricity that is sold to a third party.  *Id.*  After passing through the

turbine, the vaporized cyclopentane eventually enters a condenser.  *Id.*  The condenser is a

---

[1] In its response to the summary judgment motion, Plaintiff also filed a statement of additional material
facts.  (PSAMF, ECF No. 27.)  In opposition to Plaintiff's motion for summary judgment, Defendant also
filed a statement of additional facts.  (DSAMF, ECF No. 29.)

2

shell and tube heat exchanger with cooling water flowing through the tubes and vaporized cyclopentane flowing through the shell and around the tubes. *Id.* This process condenses the vaporized cyclopentane into a liquid, which is then returned to the beginning of the cycle. *Id.*

The water side of the condenser is divided into two sections. (*Id.* ¶ 34.) One section contains the entry points for the cooling water to enter the tubes, and the other section contains the exit points where the now heated cooling water exits the tubes. *Id.* The condenser contains 2,410 U-shaped tubes. (*Id.* ¶ 35.) Each condenser tube extends from the support plate into the cyclopentane-filled shell, makes a U-bend, and passes back through the support plate. (*Id.* ¶ 34.)

## B. Mechanical Difficulties

Beginning on December 20, 2016, the cogeneration plant experienced reduced energy efficiency, and required more biomass to achieve its expected energy output. (*Id.* ¶ 36.) On January 8, 2017, Plaintiff identified water entry and damage to the purge pump motor and instituted periodic shutdowns to remove water. (*Id.* ¶ 37.)

During the shutdowns, which occurred every 2-3 days, an average of 5-12 gallons of water were removed from the cyclopentane side of the condenser. (ECF No. 21-5 ¶ 23). The process for removing water involved shutting down the plant and allowing the water to settle to the lowest part of the circuit, as water is heavier than the cyclopentane. (PSAMF ¶ 4.) The water is drained off the bottom, and when the presence of cyclopentane is detected floating on water and by smell, the process is stopped and repeated as necessary until little to no water is detected. *Id.* The plant would then resume operation. *Id.*

On January 17, 2017, excessive water, on this occasion hundreds of gallons, entered the system and Plaintiff shut down the cogeneration plant. (SSMF ¶¶ 38, 43; ECF No. 21-5 at 56 – 58.) On January 22, 2017, Plaintiff performed a bubble test to identify leaks. (SSMF ¶¶ 39, 40.) During a bubble test, soapy solution is applied to the tubes in the water side, and the cyclopentane side is pressurized so that gas will come through fractures or breaks in the tubes. (*Id.* ¶ 40.) A fracture or leak can be identified by the presence of bubbles where the soapy water is applied. *Id.* The bubble test revealed leaks from two fractured condenser tubes. (*Id.* ¶ 39.) Between January 22 and 25, 2017, the tubes were plugged and sealed. (*Id.* ¶ 41.) Plaintiff again ran a bubble test, which did not reveal any further leaks. (*Id.* ¶ 42.)

The cogeneration plant restarted on January 30, 2017, and between January 30 and March 9, 2017, Plaintiff's system was operational, with the exception of brief shutdowns to remove water. (*Id.* ¶ 43.) At first, the shutdowns occurred daily, typically lasting two to five hours, and Plaintiff removed approximately 5-12 gallons of water. (ECF No. 21-5 ¶ 32). The frequency of the water removals diminished in the weeks that followed, and on February 20, 2017, Plaintiff reduced the frequency of the periodic shutdowns from daily to weekly. (*Id.* ¶ 33.)

On March 9, 2017, Plaintiff again shut down the cogeneration plant after discovering excessive water in the cyclopentane side of the condenser and in the feed loop. (SSMF ¶¶ 45, 49.) On March 10, 2017, a bubble test identified one broken tube. (*Id.* ¶ 46.) Plaintiff put a boroscope down the tube, which revealed that the tube was sheared off. (PSMF ¶ 3.) Between March 10 and March 12, 2017, the broken tube was plugged and

sealed. (SSMF ¶ 47.) Plaintiff again ran a bubble test, which did not reveal any further leaks. (*Id.* ¶ 48.) During the January 17 and March 9 shutdowns, no one entered the cyclopentane side of the condenser because doing so required the removal of a 48-inch diameter custom elbow, a physical and logistical challenge. (*Id.* ¶ 50.) Before the second shutdown, the cause of the damaged tubes was unknown, but after this second shutdown, Plaintiff suspected the cause might have been vibration of the tubes in the cyclopentane side of the condenser. (PSMF ¶¶ 1 – 2, 4 – 5.)

The cogeneration plant began operating on March 12, 2017, and between March 12 and March 20, 2017, Plaintiff's system was operational, with the exception of brief shutdowns to remove water on a daily basis. (SSMF ¶ 51; ECF No. 21-5 ¶ 36.)

On March 20, 2017, Plaintiff again shut down the cogeneration plant for scheduled cleaning and passivation procedures and for inspection of the cyclopentane side of the condenser to further assess the cause of the January 17 and March 9 shutdowns. (SSMF ¶ 52.) The plugging of the damaged tubes during the previous two shutdowns prevented the tubes from leaking further, but did not fix the underlying cause of the problems. (PSMF ¶ 6.) Unlike during bubble tests, Plaintiff drained and purged the cyclopentane side and left the water side pressurized. (SSMF ¶ 53.) Plaintiff identified a tube with discoloration, which leaked when it was moved. *Id.* The damaged tube was plugged and sealed, and MWP installed modifications to the condenser, designed by the manufacturer, to reduce vibration of the tubes in the future, including banding groups of condenser tubes together and installing a baffle to deflect the high velocity cyclopentane vapor from making direct

contact with the condenser tubes.  (*Id.* ¶ 54; PSMF ¶ 13.)  The water and cyclopentane sides were both pressure tested before reassembly.  (SSMF ¶ 55.)

The cogeneration plant restarted on March 25, 2017.  (*Id.* ¶ 56.)  After the installation of the modifications, the short, periodic shutdowns to remove water have become unnecessary and a very small amount of water typically is removed once a year. (PSMF ¶ 16.)

## C.  Insurance Claims Handling

Defendant issued Plaintiff an insurance policy for the May 3, 2016 to May 3, 2017 policy year.  (*Id.* ¶ 1; ECF No. 21-1.)  Defendant and Travelers entered into a reinsurance agreement effective February 1, 2015.  (*Id.* ¶ 2.)  Travelers first received notice of Plaintiff's claim from Defendant on February 8, 2017.  (*Id.* ¶ 59.)

Initially, corrosion was assumed to be the cause of the shutdowns.  (*Id.* ¶ 60.)  The claim was complex and the cause in question.  *Id.*  On March 23, 2017, Travelers retained John Imperatore, M.S.E., P.E. of Engineering Design & Testing Corp. to determine the cause and extent of Plaintiff's loss.  (*Id.* ¶ 65.)  Mr. Imperatore determined that the manufacturer's initial conclusion that corrosion had caused the condenser problems was incorrect.  (*Id.* ¶ 69.)  Mr. Imperatore determined that all of the damaged condenser tubes were damaged by turbulence caused by the cyclopentane vapor entering the condenser, resulting in vibration of the tubes and fatigue leading to failure.  (*Id.* ¶¶ 70, 72.)  The excess vibration was caused by a design defect in the condenser, attributable to the manufacturer. (*Id.* ¶¶ 71 – 72.)

Travelers' claims adjuster determined that three $100,000 deductibles applied to Plaintiff's losses because the tubes broke at three separate times and the unit operated between the events. (*Id.* ¶¶ 74 – 89.) Defendant paid Plaintiff $159,711.53 after applying a $100,000 deductible for the January 17, 2017 covered loss. (*Id.* ¶ 90.) Defendant paid Plaintiff $67,413.62 after applying a $100,000 deductible for the March 9, 2017 covered loss. (*Id.* ¶ 91.) Although Defendant concluded that a covered loss occurred in the amount of $93,877.70 on March 20, 2017, Defendant did not pay Plaintiff for that loss because the damage did not exceed the $100,000 deductible. (*Id.* ¶ 92.)

Plaintiff did not agree that three deductibles applied to its loss. (*Id.* ¶¶ 88 – 89). The total adjusted damage Defendants calculated was $521,002.85. (*Id.* ¶ 104.) The total amount Defendant paid Plaintiff on the three claims resulting from the shutdowns was $227,125.15. (*Id.* ¶ 105.) Had Defendant applied only one deductible, it would have paid Plaintiff an additional $193,877.70. (*Id.* ¶ 106.)

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "After the moving party has presented evidence in support of its motion for summary judgment, 'the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor.'" *Woodward v. Emulex Corp.*, 714 F.3d 632, 637 (1st Cir. 2013) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 158 (1st Cir. 1998)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather

simply require [a court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

A court reviews the factual record in the light most favorable to the non-moving party, resolving evidentiary conflicts and drawing reasonable inferences in the non-movant's favor. *Perry v. Roy,* 782 F.3d 73, 77 (1st Cir. 2015). If a court's review of the record reveals evidence sufficient to support findings in favor of the non-moving party on one or more of his claims, a trial-worthy controversy exists and summary judgment must be denied as to any supported claim. *Id.* ("The district court's role is limited to assessing whether there exists evidence such that a reasonable jury could return a verdict for the nonmoving party." (internal quotation marks omitted)). Unsupported claims are properly dismissed. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 – 24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses.").

## DISCUSSION

### A.    Breach of Contract

On Plaintiff's breach of contract claim, the issue is whether Defendant satisfied its obligation under the insurance contract or whether it failed to do so by improperly calculating Plaintiff's deductible.

#### 1.    Maine Law

Under Maine law, the elements of breach of contract are "(1) breach of a material contract term; (2) causation; and (3) damages." *Me. Energy Recovery Co. v. United Steel*

*Structures, Inc.,* 1999 ME 31, ¶ 7, 724 A.2d 1248. "The interpretation of a contract, including whether or not its terms are ambiguous, is a question of law . . . ." *Farrington's Owners' Ass'n v. Conway Lake Resorts, Inc.*, 2005 ME 93, ¶ 10, 878 A.2d 504, 507. "[W]hen interpreting a contract, a court needs to look at the whole instrument." *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 12, 814 A.2d 989, 993. Accordingly, courts "will interpret a contract according to the plain meaning of its language, and will avoid any interpretation that renders a provision meaningless." *Richardson v. Winthrop Sch. Dep't*, 2009 ME 109, ¶ 9, 983 A.2d 400, 403 (internal citation omitted). "The interpretation of ambiguous language in a contract, however, is a question of fact." *Id.* Language is ambiguous if it is susceptible to more than one reasonable interpretation. *Id.* If a material term is ambiguous, a factual inquiry is required and the finder of fact must consider extrinsic evidence of the parties' intended meaning. *Bangor Pub. Co. v. Union St. Mkt.*, 1998 ME 37, ¶ 6, 706 A.2d 595, 597.

A few supplemental rules apply in the insurance context. "The meaning of language used in insurance contracts is a question of law." *York Ins. Grp. of Maine v. Van Hall*, 1997 ME 230, ¶ 8, 704 A.2d 366, 369. Ambiguous terms are generally construed in favor of the insured and against the insurer. *Id.* Courts are to "view the contract language from the perspective of an average person, untrained in either the law or the insurance field, in light of what a more than casual reading of the policy would reveal to an ordinarily intelligent insured." *Peerless Ins. Co. v. Wood*, 685 A.2d 1173, 1174 (Me. 1996). The insured bears the initial burden of showing that coverage for the injury exists, then the insurer bears the burden of showing that there is an exclusion from coverage, and the

insured then bears the burden of showing there is an exception to an exclusion. *Middlesex Mut. Assur. Co. v. Fish*, 738 F. Supp. 2d 124, 132 (D. Me. 2010).

## 2.    Relevant Contract Provisions

Plaintiff's commercial property insurance policy states that Defendant "will pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (ECF No. 21-1 at 16). The Policy also provides that Defendant "will pay for the actual loss of Business Income . . . sustain[ed] due to the necessary 'suspension' of . . . 'operations' during the 'period of restoration.'" (*Id.* at 31.) "Covered Cause of Loss" means "Risks of Direct Physical Loss" unless covered by an exclusion or limitation in other sections of the policy. (*Id.* at 42.) Under exclusions to coverage, the policy states that Defendant "will not pay for loss or damage caused by or resulting from" a series of listed exclusions, including "faulty, inadequate or defective . . . design" and "[m]echanical breakdown." (*Id.* at 43 – 45.)

Plaintiff also purchased additional coverage for equipment breakdowns. The equipment breakdown coverage modified some of the exclusions in the base policy, including the exclusion related to mechanical breakdowns. The equipment breakdown coverage provided: "But if an excluded cause of loss . . . results in an 'accident,' we will pay for the loss, damage or expense caused by that 'accident.'" (*Id.* at 85.) In the equipment breakdown coverage, "accident" is defined as follows:

> [Defendant] will pay for direct physical damage to Covered Property that is the direct result of an "accident." As used in this Additional Coverage, "accident" means a fortuitous event that causes direct physical damage to "covered equipment." The event must be one of the following: . . . mechanical breakdown . . . .

*Id.* at 83.

The equipment breakdown coverage also specified that Defendant "will not pay for loss, damage or expense resulting from any 'one accident' until the amount of loss, damage or expense exceeds the applicable Deductible . . . ." (*Id.* at 87.) The term "one accident" means that "[i]f an initial 'accident' causes other 'accidents,' all will be considered 'one accident.' All 'accidents' that are the result of the same event will be considered 'one accident.'" (*Id.* at 86.)

The parties do not dispute that based on the coverage exclusions for design defects and mechanical breakdowns, the plant shutdowns of early 2017 are not covered under the base policy. The equipment breakdown coverage applies, subject to the applicable deductible.

### 3.     The "Cause" and "Effects" Theories of Interpretation

Not infrequently, insurers and insureds have disagreed over the number of "accidents" or "occurrences" when insurance claims have been adjusted. Courts and scholars have noted that the parties' respective positions often depend on the amount of the applicable deductible and the policy limits as compared to the claimed losses:

> [I]n situations where the insurance contracts at issue either are subject to applicable aggregate limits larger than the "per occurrence" limits, or where they are not subject to any aggregate limits, a policyholder can reap the benefit of a finding of more than one occurrence. On the other hand, where a policyholder has a large "per occurrence" deductible or retention, a multiple "occurrences" ruling could result in the policyholder being obligated to satisfy each "per occurrence" deductible for each claim (or group of claims depending upon the precise ruling) asserted against it.

Scott M. Seaman and Jason R. Schulze, Allocation of Losses in Complex Insurance Coverage Claims § 7:1 (2018).

Plaintiff argues that when interpreting the meaning of undefined or broadly defined words like "accident" or "occurrence," "[t]he majority of courts look to the cause or causes of damage rather than to each individual claimant's injury or the number of claims to determine whether there is one occurrence or multiple occurrences under a contract." *Id.* § 7:2. "Using this analysis, the court asks if there was but one proximate, uninterrupted, and continuing cause which resulted in all of the injuries and damage." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) (internal quotations and modifications omitted). "A minority of courts look to the 'effects' of a claim in determining the number of occurrences." Allocation of Losses in Complex Insurance Coverage Claims § 7:2. "The effect theory suggests that the wording 'each accident' 'must be construed from the point of view of the person whose property was injured.'" *SECURA Ins. v. Lyme St. Croix Forest Co., LLC*, 918 N.W.2d 885, 890 (Wis. 2018) (quoting *Anchor Casualty Co. v. McCaleb*, 178 F.2d 322, 324 (5th Cir. 1949)). Using this analysis, some courts treat each injury or claimed damage as a separate occurrence even when each injury was caused by the same conduct of the same wrongdoer. *See Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781, 788 (5th Cir. 1997) (discussing Louisiana law); Steven Pitt et al., 12 Couch on Ins. § 172:13 ("By this view, it has been held that if one cause operates on several individuals at one time, it is not one accident—rather, the injury to each individual is a separate accident").

Although some courts at times appear to treat both approaches (i.e., cause or effect) as legal tests or strict rules of law, see *Nicor, Inc. v. Associated Elec. & Gas Ins. Servs. Ltd.*, 860 N.E.2d 280, 288 (Ill. 2006) ("the cause theory represents the law of Illinois"), the approaches are better understood as providing tools or theories for interpreting undefined or broadly defined words in specific insurance contracts in a way that is consistent with, or a repeated application of, the ordinary rules of contract interpretation. *See Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 767 (7th Cir. 2010) ("many insurance policies . . . use standard language that has been developed against the backdrop of continual interpretation and reinterpretation of particular terms by the courts"); *Wright v. Turner*, 322 P.3d 476, 483 (Or. 2014) (referring to the "effects theory" and the "'cause theory' of interpretation"); *State Auto Prop. & Cas. Co. v. Matty*, 690 S.E.2d 614, 617 – 619 (Ga. 2010) (instructing courts to apply the cause theory with the caveat that it is "consistent with that contract read as a whole and in the absence of a specific, contrary definition of 'accident'" and noting that the alternative theory would have rendered other portions of the contract "meaningless," which was "plainly not the intent of the contract").[2]

The characterization of the competing tests results from one court's use of "cause" as shorthand for the conduct of a wrongdoer and the word "effects" as shorthand for the

---

[2] The cause or effect approach, however, is not always followed with courts opting to decide the issue based on the language of the insurance contract. *See Reynolds v. S & D Foods, Inc.*, 822 F. Supp. 705, 708 (D. Kan. 1993) ("Plaintiffs are attempting to read 'per claim' as 'per occurrence,' a reading which the policy forbids"); Michael Murray, *The Law of Describing Accidents: A New Proposal for Determining the Number of Occurrences in Insurance*, 118 Yale L.J. 1484, 1499 (2009) (citing *Reynolds* as an example of the effects theory); *see also Basler Turbo Conversions LLC v. HCC Ins. Co.*, 601 F. Supp. 2d 1082, 1091 (E.D. Wis. 2009) ("Of course, differences in policy language are factors in each of the foregoing cases").

damage to each victim—terms that apply in the liability context, but do not necessarily apply in other insurance contexts. *Saint Paul-Mercury Indem. Co. v. Rutland*, 225 F.2d 689, 692 (5th Cir. 1955). In *Rutland*, the Fifth Circuit considered a liability contract with one tortfeasor and multiple individuals suffering losses. *Id.* The Court found "it clear that the word 'accident' as used in the disputed phrase was intended to be construed from the point of view of the cause rather than the effect." *Id.* The Court's use of the phrase "point of view," suggests that "cause" and "effect" referred to actors—the responsible party and complaining parties.

The cause theory originated in the liability insurance context, and the vast majority of cases applying the cause theory of interpretation did so in that context. *See e.g.*, *Matty*, 690 S.E.2d at 619 ("For the foregoing reasons, we adopt the cause theory for use in liability insurance cases in Georgia"); *Aldridge Elec., Inc. v. Fid. & Deposit Co. of Maryland*, No. 04 C 4021, 2008 WL 4287639, at *5 (N.D. Ill. Sept. 10, 2008) (Noting that Illinois applies the cause test to standardized liability policies but looking to other sources because "Illinois law has not yet defined 'occurrence' in the context of employee dishonesty in a fidelity insurance case"). Indeed, some "[c]ourts have noted that the cause theory is founded in the purpose of liability coverage." *Just v. Farmers Auto. Ins. Ass'n*, 877 N.W.2d 467, 474 (Iowa 2016); *see also Truck Ins. Exch. v. Rohde*, 303 P.2d 659, 662 (Wash. 1956) (adopting the cause approach because "[p]roximate cause is an integral part of any interpretation of the words 'accident' or 'occurrence,' as used in a contract for liability insurance which indemnifies the insured for his tortious acts"); *Basler*, 601 F. Supp. 2d at 1089 (arguing for different interpretations of "occurrence" for liability insurance, on the one hand, which "is

intended to protect the insured from the liability the insured incurs to others as a result of its own unintended but tortious conduct," and "[p]roperty insurance, on the other hand, [which] is intended to provide financial protection against damage to or loss of . . . the insured's own property").

While a few courts have applied the cause theory when interpreting coverage in property loss policies, the cases typically involved wrongful conduct that arguably resembles a liability claim. *See EOTT Energy Corp. v. Storebrand Internat. Ins. Co.*, 52 Cal. Rptr. 2d 894, 901 (Cal. Ct. Ap. 1996) (series of thefts was a single occurrence). Some courts have noted that transferring causation concepts from one context to another can be unreliable because "[c]ause is a slippery concept with various meanings in various contexts." *Wright*, 322 P.3d at 484; *see also Garvey v. State Farm Fire & Cas. Co.*, 770 P.2d 704, 705 (Cal. 1989) (admonishing against utilizing causation tests from liability insurance cases in other insurance contexts).

### 4. The Cause Theory in This Case

Plaintiff contends that all the shutdowns had the same cause (i.e., high-velocity cyclopentane vapor vibrating the tubes) and, therefore, Plaintiff's losses are the result of one accident under the policy. At one level, Plaintiff's contention has some appeal. The cracks in the tubes were caused by the same phenomenon (i.e., the high-velocity cyclopentane vapor vibrating the tubes). When the cause is examined in the broad sense urged by Plaintiff, however, the cause is arguably a design defect, which would not be covered. If a series of shutdowns over the course of several months constitutes a single prolonged accident, the contractual exclusion for design defects would essentially be

meaningless in this context.  Contracts, however, are to be read as a whole and courts should "avoid any interpretation that renders a provision meaningless." *Richardson*, 2009 ME ¶ 9 (internal citation omitted).

While the cause theory might be useful when interpreting "accident" and "occurrence" in a liability policy, the approach is not particularly helpful in a property loss policy.  Standard liability policies, from which the cause test derives, ordinarily do not specifically define "accident" and usually define an "occurrence" broadly as including "continuous or repeated exposure to substantially the same general harmful conditions." *See e.g.*, *Baumhammers*, 595 Pa. at 153 (internal modification omitted).  In this equipment breakdown policy, the term "accident" is more narrowly defined.  In the relevant provision of this contract, "accident" means a "fortuitous event," and that "event," in this case, "must be" a "mechanical breakdown" to be covered.  The question is whether three mechanical breakdowns or a single prolonged mechanical breakdown occurred.

The policy excludes all damages caused by design defects, but the equipment breakdown provision covers mechanical breakdowns, even when caused by a design defect.  In other words, the mechanical breakdown coverage is a limited exception to the design defect exclusion.  A breakdown, not a design defect, triggers coverage and the corresponding deductible.  To determine the number of deductibles that apply under a specified peril policy, the focus should remain on the specified peril—the mechanical breakdown—not the design defect or other underlying cause of the specified peril.[3]

---

[3] If multiple, separate shutdowns are considered one accident for which one deductible applies whenever the shutdowns share a cause, a party's incentive to rectify mechanical problems promptly is arguably

"Mechanical breakdown" is not specifically defined in the contract. The cogeneration plant is a machine, and "breakdown" in this context can fairly be defined as "a failure to function," *Breakdown*, Merriam-Webster, www.merriam-webster.com/dictionary/breakdown, or "stops working." *Breakdown*, Macmillan Dictionary, www.macmillandictionary.com/us/ dictionary/american/breakdown; *see also Soil Remediation of Philidelphia v. Eclipse Combustion*, No. CIV. A. 95-591, 1995 WL 590176, at *6 (E.D. Pa. Oct. 5, 1995) ("The noun 'breakdown' is defined as 'the action or result of breaking down as . . . a failure to function"). This ordinary definition is consistent with other equipment breakdown insurance policies, which have defined "breakdown" as a "sudden and accidental direct physical loss to Covered Equipment, which manifests itself by physical damage, necessitating its repair or replacement." *Cowiche Growers, Inc. v. Cont'l Cas. Co.*, 449 F. App'x 594, 595 (9th Cir. 2011). Under this basic definition, logic suggests that a "breakdown" ends once the component of the machine has been repaired or replaced, and the machine begins working or functioning again.

When considering whether one or many incidents occurred for purposes of liability coverage, including deductibles, many courts have considered the temporal and spatial separation or proximity of the incidents. *See e.g.*, *Nat'l Cas. Co. v. W. Express*, No. CV-15-1222-R, 2018 WL 6059388, at *7 (W.D. Okla. Nov. 19, 2018) ("In both of those cases, the time between injuries exceeded two days. Here, the impacts as well as their affiliated

---

reduced, which appears contrary to the intention of the parties and this form of insurance. *See Basler*, 601 F. Supp. 2d at 1092.

injuries and deaths were separated in certain cases by minutes"); *SECURA,* 918 N.W.2d at 890 ("If cause and result are so simultaneous or so closely linked in time and space as to be considered by the average person as one event, then only a single occurrence has taken place") (internal quotations omitted); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 87 A.D.3d 1057, 1061, 930 N.Y.S.2d 215, 220 (2011) ("In this regard, courts 'must analyze the temporal and spatial relationships between the incidents and the extent to which they were part of an undisrupted continuum to determine whether they can . . . be viewed as a single unfortunate event—a single occurrence'") (quoting *Appalachian Ins. Co. v. General Elec. Co.*, 863 N.E.2d 994 (N.Y. Sup. Ct. 2011)).

The temporal proximity or separation is relevant here. While terms like "occurrence" in other insurance contracts can reasonably refer to a broader scope of events, the word "breakdown" is ordinarily used with a far narrower temporal scope. A series of similar mechanical failures are ordinarily referred to as separate breakdowns, not a single breakdown. *See e.g.*, *Janke v. Brooks*, No. 11-CV-00837-REB-BNB, 2012 WL 1229891, at *2 (D. Colo. Apr. 11, 2012) ("The car broke down several times in the first 25 miles, after which plaintiffs hired [a] mechanic . . . to inspect and evaluate the build"); *Nicklasson v. Roper*, 491 F.3d 830, 832 (8th Cir. 2007) ("Their vehicle broke down a number of times along I-70" in a single day); *McAlpine v. Dahl*, 179 Mont. 23, 24, 585 P.2d 1307, 1308 (1978) ("The truck and trailer had four breakdowns" in a single day, "the final one occurring about 9:30 p.m.").

The record establishes that Plaintiff experienced multiple tube breakages that resulted in three significant shutdowns for repairs, with each shutdown occurring weeks or

more apart, and where the plant operated between the breakages.  Plaintiff argues the plant experienced a single prolonged breakdown because of the series of brief shutdowns to remove small amounts of water on numerous occasions between the major incidents. While under some definitions, a "breakdown" can extend to difficulties that represent something less than a total loss of function *see e.g.*, *Nat'l Inv'rs Fire & Cas. Co. v. Preddy*, 451 S.W.2d 457, 458 (Ark. 1970) (interpreting "mechanical breakdown" as "a functional defect in the moving parts of the equipment which causes the latter to cease functioning or to function improperly"), the plant functioned in between the claimed losses, which involved separate, prolonged shutdowns of the plant due to the breakdown of separate tubes.

### 5.    Application of the "One Accident" Provision in this Case

Plaintiff principally relies on the defined term "one accident."  Under the equipment breakdown coverage, "[i]f an initial 'accident' causes other 'accidents,' all will be considered 'one accident'" and "[a]ll 'accidents' that are the result of the same event will be considered 'one accident.'"  An "accident" is defined as a "fortuitous event" which "must be" one of the five named perils, and the only named peril that applies to these facts is a "mechanical breakdown."  In other words, it will constitute "one accident" "if an initial [named peril] causes other [named perils]" or if "all [named perils] are the result of the same event."  Plaintiff argues that it experienced "one accident" because all tube breakages were caused by high-velocity cyclopentane vapor vibrating the tubes.  "High-velocity cyclopentane vapor vibrating the tubes" describes an ongoing process; it describes the effects of a design defect that is excluded from coverage; it does not describe an "event."

To interpret the policy as urged by Plaintiff would essentially render the exclusion for design defects meaningless in this context and in any context in which a design defect caused multiple breakdowns. In other words, if the physical effects of an underlying defect constituted an "event" for purposes of defining "one accident" under the equipment breakdown coverage, coverage for all losses resulting from a design defect would be covered despite the exclusion. Instead, as Defendant argues, under these circumstances where only one of the five specified perils applies, the contract, including the definition of "accident" or "one accident" is logically construed to apply to multiple shutdowns only where the break in one tube caused other tubes to break.

The record lacks any evidence upon which a fact finder could reasonably conclude that the second tube fracture in March 2017 was caused by the tubes that fractured and were the cause of the shutdown in January 2017. The January shutdown and the March 9 shutdown, therefore, constitute two separate events/accidents/mechanical breakdowns.

The current record, however, generates a factual question as to whether the tube fracture discovered during the March 9 shutdown caused or contributed to the tube fracture discovered during the March 20 shutdown. Among thousands of tubes, the two fractures occurred on immediately adjacent tubes and in virtually identical locations, where those tubes connected to the last support plate before making their U-bends at the far end of the condenser. (Imperatore Report, ECF No. 21-5 at 40, Figure 13.) Not insignificantly, the March 9 tube fracture was a clean break, with part of the tube separating entirely from the remainder of the tube. (Imperatore Deposition, ECF No. 21-7 at 56:4 – 14.) In an email in spring 2017, one of Plaintiff's employees explained:

When the tubes were moving side-to-side, they were hitting against each other which limited the distance they travelled - we could see marks where the tubes had been hitting each other. Except for the tube on the far right or far left of a row. That tube had no neighbor on one side of it to hit against and limit its movement. That tube was able to move further in that one direction, like the last ball in a Newton's Cradle. Every tube that broke off was one of those outside in a row. The last leak we found was just cracked. It was cracked on the side toward its one neighbor tube, just like you would expect when the tube is flexing too far away from its neighbor.

(Imperatore Report at 14 – 15 ¶ 42.)

The record evidence, including the expert evidence, thus presents the possibility that the fracture discovered on March 20 was damaged when part of the adjacent tube broke free or that the fracture occurred because the tube had additional room to vibrate once its neighboring tube broke free of the support bracket. The temporal relationship between the two fractures also suggests a possible connection between the fractures. If the March 20 fracture was caused in part by the March 9 breakage, the two fractures could be considered one accident under the policy. Because a factual issue exists as to whether the March 20 fracture was caused in some way by the March 9 breakage, the Court cannot determine on summary judgment whether the March shutdowns constitute one or two accidents and thus one or two mechanical breakdowns under the policy.

**B.      Unfair Claims Settlement Practices**

Maine's Unfair Claims Settlement Practices Act generally prohibits insurers from offering threats or knowing misrepresentations, failing to act within a reasonable time, or contesting the basis or amount of liability without a reasonable basis. 24-A M.R.S. § 2436-A; *see generally Curtis v. Allstate Ins. Co.*, 787 A.2d 760, 766 (Me. 2002). Plaintiff has not produced any evidence that would constitute threats or knowing misrepresentations.

Given the Court's conclusion that Defendant's interpretation of the policy is correct, the record lacks any evidence that Defendant acted unreasonably even if the March shutdowns are ultimately determined to constitute one mechanical breakdown.

## CONCLUSION

Based on the foregoing analysis, the Court denies Plaintiff's Motion for Summary Judgment, (ECF No. 23), and grants Defendant's Motion for Summary Judgment in part. (ECF No. 25.) The Court grants Defendant's Motion for Summary Judgment as to the Unfair Claims Settlement Practices claim, grants Defendant's Motion for Summary Judgment to the extent Defendant contends at least two deductibles apply, and denies Defendant's Motion for Summary Judgment to the extent Defendant contends a third deductible applies.

SO ORDERED.

/s/ John C. Nivison
U.S. Magistrate Judge

Dated this 27th day of June, 2019.